FILED
2016 Jan-15  PM 02:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH NORWOOD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 5:14-cv-00430-CLS |
| | ) | |
| KIM T. THOMAS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Joseph Norwood, asserts federal and state-law claims against the following five defendants:  Kim T. Thomas, Commissioner of the Alabama Department of Corrections; Corizon, Inc., the contract healthcare service provider for the Alabama Department of Corrections; Bettina Carter, Warden of the Work Release Facility in Decatur, Alabama; Leon Forniss, Warden of the Staton Correctional Facility in Elmore, Alabama; and LeVan Thomas, Warden of the Frank Lee Work Release Center in Deatsville, Alabama.  Each of the individual defendants was sued in both his or her individual and official capacities.

Plaintiff's complaint asserts federal claims for violation of his Fourteenth Amendment substantive due process right to bodily integrity (Count I),[1] violation of his Eighth Amendment right to be free from cruel and unusual punishment (Count

---

[1] *See* doc. no. 1 (Complaint), ¶¶ 21-28.

II),[2] and intentional infliction of emotional distress under 42 U.S.C. § 1985(3) (Count III).[3]  His complaint also alleges supplemental state-law claims for wantonness (Count IV) and breach of contract (Count V).[4]  *See* 28 U.S.C. § 1367(a).  Plaintiff claims compensatory and punitive damages, costs, and attorney's fees.

This court dismissed all claims alleged against the individual defendants employed by the Alabama Department of Corrections in their *official capacities* by means of a memorandum opinion and orders entered on December 12, 2014.[5]  The same decision also dismissed the Fourteenth Amendment substantive due process claim alleged in Count I of plaintiff's complaint, but only against the individual defendants,[6] because Corizon, Inc., did not join in the motion to dismiss filed by the individual defendants.  Consequently, that claim remained pending against Corizon.[7]

The action now is before the court on the amended motions for summary judgment filed by Corizon, Inc., and the individual defendants.[8]  Federal Rule of Civil Procedure 56 provides that summary judgment should be rendered if the pleadings,

---

[2] *Id.* ¶¶ 29-34.

[3] *Id.* ¶¶ 35-42.

[4] *Id.* ¶¶ 43-48 (wantonness); *id.* ¶¶ 49-56 (breach of contract).

[5] *See* doc. no. 19 (Memorandum Opinion and Orders), at 8-9 and 19.

[6] *Id*. at 9-11 and 19.

[7] *Id*. at 11 n.11.

[8] *See* doc. no. 35 (Corizon's Amended Motion for Summary Judgment); doc. no. 36 (ADOC Defendants' Amended Motion for Summary Judgment).

the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis supplied).

*See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

Applying the foregoing standards, and following consideration of the pleadings, briefs, and evidentiary submissions, the court concludes that both motions should be granted, but only as to plaintiff's federal claims.

## I.  SUMMARY OF FACTS

Plaintiff was convicted during February of 2000 in the Circuit Court for Houston County, Alabama, of the state criminal offense of distribution of cocaine, and sentenced to 42 years of incarceration in the custody of the Alabama Department of Correections ("ADOC").[9]  Plaintiff served only three years of that sentence before he was released on parole by the Alabama Board of Pardons and Paroles.[10]  On November 14, 2008, however, while still on parole, plaintiff's vehicle was pulled over and searched by police.  Crack cocaine was found inside the vehicle.[11]  As a result, plaintiff's parole was revoked, and he was remanded to the custody of the ADOC on January 28, 2010.[12]

---

[9] *See* doc. no. 35-2 (Norwood Deposition), at 16.

[10] *Id*.

[11] *Id*. at 18-19.

[12] *Id*. at 11, 13.

4

On March 5, 2012 — the date on which plaintiff sustained the injury that forms the basis of this action — he was being housed in the Decatur, Alabama, Work Release Facility.   Although incarcerated in Decatur, plaintiff was assigned to a landscaping crew performing work for the City of Athens, Alabama.[13]  His supervisor, Roger Weldon, directed him to cut down a small tree with a chainsaw.  Plaintiff had never before operated a chainsaw.  In addition, he was not provided goggles or other safety equipment.[14]  While operating the chainsaw, a gust of wind blew sawdust and wood chips into plaintiff's right eye.[15]  When he returned to the Decatur Work Release Facility at the conclusion of his shift, plaintiff "filled out a sick call form" provided by defendant Corizon, Inc., for the purpose of requesting examination by one of Corizon's jail nurses.[16]  Even so, he was not seen by a nurse that evening.

Early on the morning of the following day, Tuesday, March 6, 2012, plaintiff returned to work in Athens.  He soon began to experience acute eye pain and vomited.[17]  His supervisor allowed him to return to the Decatur Work Release Facility

---

[13] *Id.* at 32.

[14] Doc. no. 51 (Plaintiff's Response in Opposition to Summary Judgment) ¶ 1; *see also* doc. no. 35-2 (Norwood Deposition), at 33-34.

[15] Doc. no. 35-2 (Norwood Deposition), at 33-34.

[16] *Id.* at 34-35 (alteration supplied).  Bettina Carter, the Warden at Decatur Work Release Facility, attested that plaintiff "was initially told to fill out a sick call slip because that is the agency policy for non-emergency situations."  Doc. no. 31-3 (Carter Affidavit), at 3.

[17] Doc. no. 35-2 (Norwood Deposition), at 36.

before the end of his shift.  When plaintiff arrived at the facility, he told correctional

officers about his injuries, and was instructed to fill-out another "sick call form."[18]

He continued to vomit throughout the afternoon, and his right eye began to swell.[19]

Plaintiff was not scheduled to work on Wednesday, March 7, 2012.  He waited

for the sick call announcement, but he was not among the inmates who were called

to the health care unit ("HCU").  By that point, however, plaintiff's pain had become

so intense that he walked to the HCU.  The on-duty nurse, identified in this record

only as "Nurse Wallace," asked what plaintiff was doing at the HCU.  Plaintiff told

her that, despite having submitted sick call slips on each of the two previous days, he

had not been called to the HCU, and his eye was hurting and swelling.  Despite the

fact that plaintiff's eye was obviously swollen,[20] Nurse Wallace "told [him] to get the

hell out of there," and added that she would attend to him "when she [got his] sick

---

[18] *Id.* "Sick call" is a common procedure used for inmate health care:

Correctional heath care is guided by several fundamental principles.  Inmates may make a request for health care attention at any time.  Requests that are emergent are attended to immediately.  Requests that are not emergent are reviewed every day; this often is called sick-call triage.  Nurses usually are the professionals responsible for reviewing and responding to requests for health care attention via sick call.

*Screening, Sick Call and Triage*, NATIONAL COMMISSION ON CORRECTIONAL HEALTH CARE (2010), http://www.ncchc.org/cnp-screening-sickcall-triage (last visited Jan. 15, 2016).

[19] Doc. no. 35-2 (Norwood Deposition), at 36.

[20] *Id*. at 37 ("[T]he thing about it, it wasn't swollen *around* my eye.  It was *my eyeball* swelling, coming out like a mullet, a Popeye mullet fish.") (alteration and emphasis supplied); *id.* at 90.

call [form]."[21]

On the night of the following day, Thursday, March 8, 2012, plaintiff still had not been examined by a Corizon nurse, and he was "vomiting real bad."[22]

On the afternoon of Friday, March 9, 2012 — four days after injury — plaintiff took a photograph of his swollen eye with a fellow inmate's contraband cellular telephone and sent the picture to his mother as an attachment to a text message. That evening, he called his mother to explain how his eye had been injured, and informed her that the prison staff was ignoring his medical needs.[23] Plaintiff testified that his mother immediately

> called up there, and they said that they were going to give — get me some medical attention. They said my eye — she didn't tell them that she saw my eye. She told them that she spoke with me and everything, and they said that my eye wasn't [as] bad as I probably made it out to be. But my eyeball itself was bigger than a golf ball. And so, my mom told me that she was going to find an attorney. And while she was saying she was going to find an attorney, [the correctional officers] were calling me [over the intercom], telling me to put on my prison whites, I was about to go to Limestone [Correctional Facility to see a nurse].

Doc. no. 35-2 (Norwood Deposition), at 41 (alterations supplied).

Thus, on the night of Friday, March 9, 2012, plaintiff was transported to Limestone Correctional Facility, and then from there to Crestwood Medical Center

---

[21] *Id*. at 38 (alterations supplied).

[22] *Id.* at 39-40.

[23] *Id.* at 40 (alteration supplied).

in Huntsville, Alabama,[24] where he finally was examined by a physician during the early morning hours of Saturday, March 10, 2012, five days after his injury.  Dr. Wayne Jones, the emergency room physician who examined plaintiff, noted abrasions on his right cornea.[25]   He wrote prescriptions for Lortab and Ciprofloxacin Ophthalmic Solution, and entered the following statements in his report:  "Patient agrees to follow up with *EMERGENCY ROOM.  Instructed to obtain follow up care in *one day*."[26]   Dr. Jones gave the correctional officers escorting plaintiff several sheets of paper to return to the nurses at the Limestone Correctional Facility.[27]

Plaintiff spent the night of March 10th in a cell at Limestone Correctional Facility, where he alleges that nurses administered Lortab pills to him every four hours, but did not provide him with the Ciprofloxacin Ophthalmic Solution (eye drops).[28]  The following day, a nurse gave plaintiff his eye drops, but informed him

---

[24] *Id.* at 42.

[25] Doc. no. 35-3 (Medical Records), at ECF 17-20.  "ECF" is an acronym formed from the initial letters of the name of a filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing").  Bluebook Rule 7.1.4 allows citation to page numbers generated by the ECF header.  *The Bluebook: A Uniform System of Citation*, at 21 (Columbia Law Review Ass'n et al. eds., 19th ed. 2010).  Even so, the Bluebook recommends against citation to ECF pagination in lieu of original pagination.  Consequently, unless stated otherwise, this court will cite to the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters "ECF."

[26] Doc. no. 35-3 (Medical Records), at ECF 20 (ALL CAP emphasis in original, italicized emphasis supplied).

[27] Doc. no. 35-2 (Norwood Deposition), at 45.

[28] *Id.*

that he would not be returning to the doctor at Crestwood for "follow up care" as directed by Dr. Wayne Jones, or transported to a specialist.[29]

In summary, plaintiff's eye was lacerated by flying wood chips on *Monday*, March 5, 2012, and he received no medical care until the following *Saturday*, March 10, 2012. The emergency room physician wrote that plaintiff should be seen for a follow-up examination in "one day," but, as will be seen, plaintiff was neither returned to the emergency room, nor examined by an optometrist or ophthalmologist for four additional days.

Plaintiff was examined by optometrists Robert Sandlin and Megan Morris in Athens, Alabama, on or about March 14, 2012.[30] Dr. Morris gave plaintiff a small bottle of "Pred Forte" eye drops, and instructed him to administer the drops four times each day, and to return for a follow-up visit "on or about 03/21/2012."[31] Plaintiff states that the Pred Forte drops decreased the swelling in his eye.[32]

By March 20, 2012, however, plaintiff had used the entire bottle of Pred Forte drops.[33] Consequently, he asked Charles Hooper, an on-site certified registered nurse

---

[29] Doc. no. 35-2 (Norwood Deposition), at 45.

[30] Doc. no. 31-2 (Inmate Movement History), at ECF 6; doc. no. 35-3 (Medical Records), at ECF 26.

[31] Doc. no. 35-3 (Medical Records), at ECF 33.

[32] Doc. no. 1 (Complaint) ¶ 13.

[33] *Id.*

practitioner at Decatur Work Release Facility, when he would again be seen by Dr. Sandlin or Dr. Morris.  Hooper replied: "Real soon."[34]  By the following day, March 21, 2012, plaintiff was experiencing sharp pains and blurred vision, and he returned to the HCU, seeking some relief.[35]  He says that he was again ordered to return to his cell because he did not have a sick call appointment.[36]

Throughout the ensuing days, plaintiff informed various correctional officers of his symptoms, but was repeatedly directed to fill-out Corizon sick call forms, and to return to his cell.  In frustration, he requested a meeting with defendant Bettina Carter, the Warden of the Decatur Work Release Facility.  He met with her on March 27, 2012.[37]  During that meeting, plaintiff complained that the medical staff was not providing appropriate care for his injury.[38]  Warden Carter telephoned the HCU, spoke with the nurses, and then told plaintiff that, if he did not see an eye specialist within the week, to come back and inform her.[39]

Plaintiff was taken to see Dr. Morris in Athens on March 30, 2012:  three days

---

[34] Id.

[35] Id. ¶ 14.

[36] Id.

[37] Doc. no. 31-3 (Carter Affidavit), at 2.

[38] Id.

[39] Id.

after his meeting with Warden Carter.[40]  Dr. Morris reported that plaintiff was "doing better," and that his inflammation and acute conjunctivitis had resolved.[41]

Plaintiff was transferred to the Alabama Therapeutic Education Facility ("ATEF") in Columbiana, Alabama, on April 16, 2012.[42]

Plaintiff made two visits to the nurse prior to May 3, 2012.[43]  He testified that, during each of those visits "a Corizon nurse" filled-out a form indicating that he needed to see an opthalmologist, and submitted it to her superior.[44]  Plaintiff alleges that, on May 3rd, that nurse told him that Corizon had denied her request for plaintiff to be examined by an ophthalmologist.[45]

During a routine physical examination on May 14, 2012, a different Corizon nurse noticed plaintiff's eye and inquired about his injuries.[46]

---

[40] Doc. no. 31-2 (Inmate Movement History), at ECF 6.

[41] Doc. no. 35-3 (Medical Records), at ECF 38.

[42] Doc. no. 35-2 (Norwood Deposition), at 53; doc. no. 31-2 (Inmate Movement History), at 5.  "The Alabama Therapeutic Education Facility opened in March 2008 and is a residential reentry center that uses tested cognitive behavioral reentry treatment and vocational training to help offenders change their criminal thinking and behavior."
See http://www.cecintl.com/facilities_rr_al_001.html (last visited Nov. 16, 2015).

[43] Doc. no. 35-2 (Norwood Deposition), at 56-57.

[44] Id. at 57.

[45] Id.  The medical records do not entirely support plaintiff's assertion.  Corizon medical personnel submitted two ophthalmologist Consultation Request Forms on plaintiff's behalf, and both were approved.  See doc. no. 35-3 (Medical Records), at ECF 31-40 (no denial of plaintiff's request to see an opthalmologist).  It should be noted, nevertheless, that plaintiff's appointment was scheduled for September — six months after his injury.  Id. at ECF 31, 42.

[46] Doc. no. 35-2 (Norwood Deposition), at 55.

11

Plaintiff was examined by Dr. Jay Glover at Callahan Eye Hospital at the University of Alabama at Birmingham during September of 2012.[47]  Dr. Glover reported that plaintiff's "optic nerves [did] not look glaucomatous."[48]

Plaintiff was transferred to the Frank Lee Work Release Center in Deatsville, Alabama, on October 10, 2012.[49]  He was again examined by a physician at UAB's Callahan Eye Hospital on December 3, 2012.[50]  That physician wrote "Glaucoma suspect" on plaintiff's Provider Consultation Report, and stated that plaintiff needed to "obtain [Timolol and Alphagan P drops] immediately, or [he] may lose [his] vision permanently!"[51]

On the same day, plaintiff was examined by Dr. Scott Hartzell, an ophthalmologist, at the University of Alabama at Birmingham glaucoma clinic:  an entity separate from the Callahan Eye Hospital.[52]  Dr. Hartzell formally diagnosed plaintiff with glaucoma, and recommended that he continue taking Alphagan P and Timolol 0.5% drops.  He also added Xalatan drops to plaintiff's medication

---

[47] Doc. no. 35-3 (Medical Records), at ECF 43; doc. no. 35-2 (Norwood Deposition), at 60, 63-64; doc. no. 51-5 (Griffin Affidavit), at ECF 3.  *See also* note 45, *supra*.

[48] Doc. no. 35-3 (Medical Records), at ECF 43 (alteration supplied).

[49] Doc. no. 35-2 (Norwood Deposition), at 62.

[50] *Id.*

[51] Doc. no. 35-3 (Medical Records), at ECF 57 (alterations supplied).

[52] Doc. no. 35-2 (Norwood Deposition), at 65; doc. no. 35-3 (Medical Records), at ECF 54.

12

regimen.[53]   Under the heading "Other Recommendations," Dr. Hartzell wrote "None."[54]

At some point between December of 2012 and January of 2013, however, plaintiff "started bumping into things at the prison," and complained to the staff at the Frank Lee Work Release Facility.  He was transported to a consultation appointment with Dr. Kirk Sturridge at a Dothan, Alabama facility known as "Eye Center South" on January 27, 2013.[55]  Dr. Sturridge recommended surgery that same day, in order to alleviate the excessive pressure in plaintiff's eyes.[56]

During the ensuing surgical procedure, Dr. Sturridge cut and placed stitches in plaintiff's eyeball.  Plaintiff contends that he should have received his filled prescription for corticosteroid eye drops on January 27th— the purported date of his eye surgery — but that he did not actually receive the eye drops until February 4, 2013.[57]  He claims that delay resulted in his having to go to the eye hospital emergency room at the University of Alabama at Birmingham.[58]  The medical records

---

[53] Doc. no. 35-3 (Medical Records), at ECF 54.

[54] *Id.*

[55] Doc. no. 35-2 (Norwood Deposition), at 66-67.

[56] *Id.* at 68.

[57] *Id.* at 69.

[58] *Id.* at 73; *see* doc. no. 35-4 (Medical Records), at ECF 9; *but see* doc. no. 35-3 (Medical Records), at ECF 94 (letter from Dr. Kirk Sturridge to ADOC, dated March 25, 2013, stating that plaintiff "is using his postoperative drops").

contradict plaintiff's claims, however. Corizon medical personnel submitted a Consultation Request Form for glaucoma filter surgery on plaintiff's behalf on January 30, 2013, and he underwent surgery on February 4, 2013.[59] Those records also state that, the following day, February 5, 2013, plaintiff attended a "one-day follow up" appointment with Dr. Sturridge.[60]

Plaintiff was examined by Dr. Sturridge on multiple occasions after his February 4, 2013 surgery.[61] As part of his post-operative treatment, Dr. Sturridge "would take [plaintiff's] eyeball and take an instrument and take his finger and squeeze it to . . . make fluid squeeze out where the [stitches were] to make fluid come out" for the purpose of alleviating pressure in the eye.[62]

Following plaintiff's first surgical procedure, Dr. Sturridge prescribed corticosteroid eye drops, but plaintiff, who was not driven back to camp from work-release until approximately seven p.m. each night, routinely missed the six p.m. "pill call."[63] He testified that, "[a] lot of times[,] the nurse wouldn't wait for [him] to get

---

[59] Doc. no. 35-3 (Medical Records), at ECF 61, 68.

[60] *Id.* at 74.

[61] *See, e.g.*, doc. no. 35-4 (Medical Records), at ECF 5, 12, 21, 26, 29, 32, 34, 40, 45, 51, 65, 72.

[62] Doc. no. 35-2 (Norwood Deposition), at 27-28 (alterations and ellipsis supplied); doc. no. 35-3 (Medical Records), at ECF 69.

[63] Doc. no. 35-2 (Norwood Deposition), at 70-72. Plaintiff testified that no one at the facility would hold his medications for him.

in from work,"[64] and the only time a nurse gave his eye drops to a correctional officer for delivery to plaintiff when he returned from work was after his mother called the facility and complained.[65]   Plaintiff also telephoned defendant LeVan Thomas, Warden of the Frank Lee Work Release Center, who assured him that his medications would be available upon his return from work.  Even so, whenever plaintiff returned, the medications were not there.[66]

Plaintiff underwent a second surgical procedure at Eye Center South on April 11, 2013.[67]  Following that surgery, plaintiff was given a small bottle of Prednisolone Acetate, which he was told to administer every hour.[68]

Plaintiff returned to Eye Center South on April 22, 2013.[69]  He alleges in his complaint that, during the examination, Dr. Sturridge told him that he could go blind because he had been deprived of Prednisolone Acetate for five days.[70]  Plaintiff also alleges that Dr. Sturridge filed a complaint on behalf of plaintiff with the ADOC.[71]

---

[64] *Id.* at 72 (alterations supplied).

[65] *Id.*

[66] *Id.* at 72-73.

[67] *Id.* at 75.

[68] Doc. no. 35-4 (Medical Records), at ECF 22.

[69] *Id.* at ECF 26.

[70] Doc. no. 1 (Complaint), at 6 ¶ 19.  Note:  There is no evidence of that statement in the medical records.

[71] There is no written complaint by anyone affiliated with Eye Center South to ADOC in the record.  *But see* doc. no. 35-4 (Medical Records), at ECF 55 (Corizon nurse notes containing the statement:  "Apparently pt's Brother called [Eye Center South] reporting pt has not received his

In May of 2013, plaintiff's mother met with defendant LeVan Thomas, the Warden of the Frank Lee Work Release Center.  Her affidavit states that

> Mr. Thomas told me he was sorry for all the problems that Joseph had [been] dealing with [in connection with] his eye [injury] and his meds and eye drops and that basically it was the Nurses' fault because they [came] from another prison.  Mr. Thomas also said that if Joseph has any problem with the Nurses or Officers about his eye, for him to come see him.  I brought up the fact that Joseph's eye had been swollen for a while.  Mr. Thomas said that they were going to take care of everything.

Doc. no. 51-5 (Griffin Affidavit), at ECF 4 (alterations supplied).

Plaintiff was released from ADOC custody on April 6, 2015.[72]  Before his release, however, plaintiff underwent a total of four surgical procedures, and will require further operations to prevent complete blindness.[73]  He already has lost some of his peripheral vision.[74]

## II.  PLAINTIFF'S SUBSTANTIVE DUE PROCESS CLAIM AGAINST CORIZON, INC.

The court finds that plaintiff's substantive due process claim against defendant Corizon, Inc., is due to be dismissed for the same reasons stated in the December 12, 2014 order dismissing that claim against the individual ADOC defendants: *that is*,

---

Prednisolone in 3 weeks.") (alteration supplied).

[72] Doc. no. 31-2 (Inmate Movement History), at 5.

[73] *See* doc. no. 35-2 (Norwood Deposition), at 90.

[74] *Id.*

16

The Supreme Court has made clear that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citations omitted).

Because plaintiff was imprisoned following a criminal conviction at the time of the alleged violations, his claims are properly brought for deliberate indifference to serious medical needs under the Eighth Amendment. *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (holding that the Eighth Amendment provides explicit constitutional protection for claims by prisoners against correctional officers for "deliberate indifference" to a substantial risk of serious harm). He is not entitled to bring an independent claim under the Fourteenth Amendment for violations of his substantive due process rights based on the same alleged conduct. *See Edwards v. Gilbert*, 867 F.2d 1271, 1274 (11th Cir. 1989) (holding that, if an inmate is entitled to protection under the Eighth Amendment, "then [he] is afforded 'no greater [substantive] protection' by the due process clause.") (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)). *See also Lee v. Sikes*, 870 F. Supp. 1096, 1101 (S.D. Ga. 1994) (rejecting an inmate's separate substantive due process claim and analyzing only the cruel and unusual punishment claim where both claims arose from the same prison workplace injury). Accordingly, plaintiff's Fourteenth Amendment substantive due process claim (Count I) is due to be dismissed as to the individual defendants.

Doc. no. 19 (Memorandum Opinion and Orders), at 10-11 (alterations in original, footnote omitted).

### III. PLAINTIFF'S EIGHTH AMENDMENT DELIBERATE INDIFFERENCE CLAIM AGAINST CORIZON, INC.

The record reveals that plaintiff received extensive off-site treatment for his eye injury. He was examined by three optometrists and at least three opthalmologists, in

17

addition to other doctors.[75]   Moreover, Corizon approved at least seventeen

Consultation Request Forms submitted by its medical staff on plaintiff's behalf.[76]

There are many inconsistencies between plaintiff's allegations and his medical

records, and this court will adopt the facts as set forth in the medical records where

such inconsistencies exist.[77]   *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When

opposing parties tell two different stories, one of which is blatantly contradicted by

the record, so that no reasonable jury could believe it, a court should not adopt that

---

[75] *See* doc. no. 35-3 (Medical Records), at ECF 20 (**Dr. Wayne Jones, emergency room physician**); doc. no. 35-3 (Medical Records), at ECF 26, 32, 36 (**Dr. Robert Sandlin, optometrist**); doc. no. 35-3 (Medical Records), at ECF 37-38 (**Dr. Megan Morris, optometrist**); doc. no. 35-3 (Medical Records), at ECF 54 (**Dr. Scott Hartzell, opthalmologist**); doc. no 35-3 (Medical Records), at ECF 43, 51 *and* doc. no. 35-4 (Medical Records), at ECF 8 (**Dr. Jay Glover, opthalmologist**); doc. no. 35-3 (Medical Records), at ECF 70, 74, 90, 93 *and* doc. no. 35-4 (Medical Records), at ECF 18, 23, 30, 36, 43, 50, 53, 64-65, 73-74 *and* doc. no. 35-5 (Medical Records), at ECF 20, 22 (**Kirk Sturridge, opthalmologist**); doc. no. 35-3 (Medical Records), at ECF 61, 63, 65-66, 86 *and* doc. no. 35-4 (Medical Records), at ECF 13 (**Dr. Michael Bradford, optometrist**); doc. no. 35-3 (Medical Records), at ECF 42, 46, 48-50 (**Dr. Lawrence, specialty unknown**); doc. no. 35-4 (Medical Records), at ECF 1-5, 24-25 *and* doc. no. 35-5 (Medical Records), at ECF 11 (**Dr. Bobby Crocker, specialty unknown**); doc. no. 35-4 (Medical Records), at ECF 34, 38-39 (**Dr. Simon Issac, specialty unknown**); doc. no. 35-5 (Medical Records), at ECF 1 (**Dr. Marcial Mendez, specialty unknown**).

[76] *See, e.g.*, doc. no. 35-3 (Medical Records), at ECF 31, 42, 48, 50, 53, 61-65, 71, 76, 80, 85, 91; doc. no. 35-4 (Medical Records), at ECF 1, 7, 26, 61; doc. no. 35-5 (Medical Records), at ECF 5.

[77] For example, plaintiff testified that the "first set of [eye] drops [he] had [came] from the emergency room [on or about March 10, 2012]. And [he] had those drops until [he] ran out. And the next time [he] was ordered some drops was when [he] . . . went to Eye Center South in 2013." Doc. no. 35-2 (Norwood Deposition), at 50 (alterations and ellipsis supplied). That is contradicted by the medical records. Dr. Megan Morris prescribed Pred Forte drops "qid" (four times per day) for plaintiff on March 14, 2012. *See* doc. no. 35-3 (Medical Records), at ECF 33. [**Note**: "Prescribed" and "receipt/dispensing" are not the same.] Dr. Morris also gave plaintiff free samples of non-prescription artificial tears when she examined him on March 30, 2012. *See id.* at ECF 37.

version of the facts for purposes of ruling on a motion for summary judgment.");

*Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253-54 (11th Cir. 2013) (same).

*See also Whitehead v. Burnside*, 403 F. App'x 401, 403 (11th Cir. 2010) (citing

*Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990)) ("Self-serving statements by a

plaintiff do not create a question of fact in the face of contradictory,

contemporaneously created medical records.").  Of course, the court will accept as

true any of plaintiff's sworn testimony that is not directly contradicted by information

contained in his contemporaneously created medical records.

"When a private entity . . . [such as Corizon] contracts with a county to provide

medical services to inmates, it performs a function traditionally within the exclusive

prerogative of the state" and, accordingly, the entity "becomes the functional

equivalent" of the state under 42 U.S.C. § 1983.  *Buckner v. Toro*, 116 F.3d 450, 452

(11th Cir. 1997) (alteration supplied).

> The Supreme Court has placed strict limitations on municipal
> liability under § 1983. A county's liability under § 1983 may not be
> based on the doctrine of respondeat superior.  *City of Canton v. Harris*,
> 489 U.S. 378, 385, 103 L. Ed. 2d 412, 109 S. Ct. 1197 (1989);  *Monell
> v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 56 L. Ed. 2d 611, 98 S. Ct.
> 2018 (1978).  A county is "liable under section 1983 only for acts for
> which [the county] is actually responsible."  *Marsh v. Butler County*,
> 268 F.3d 1014, 1027 (11th Cir. 2001) (en banc).  Indeed,  a county is
> liable only when the county's "official policy" causes a constitutional
> violation.  *Monell*, 436 U.S. at 694. Thus, [the plaintiff] must "identify
> a municipal 'policy' or 'custom' that caused [his] injury."  *Gold v. City*

*of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (quotation marks omitted) (alteration in original) (citing *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403, 137 L. Ed. 2d 626, 117 S. Ct. 1382 (1997).

> A plaintiff . . . has two methods by which to establish a county's policy: identify either (1) an *officially promulgated* county policy or (2) an *unofficial* custom or practice of the county *shown through the repeated acts of a final policymaker* for the county [or state]. *Monell*, 436 U.S. at 690-91, 694; *Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir. 1999) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121, 99 L. Ed. 2d 107, 108 S. Ct. 915 (1988)). Because a county rarely will have an officially-adopted policy of permitting a particular constitutional violation, most plaintiffs . . . must show that the county has a custom or practice of permitting it and that the county's custom or practice is "the 'moving force [behind] the constitutional violation.'" *City of Canton*, 489 U.S. at 389 (alteration in original) (citing *Monell*, 436 U.S. at 694 and *Polk County v. Dodson*, 454 U.S. 312, 326, 70 L. Ed. 2d 509, 102 S. Ct. 445 (1981)).

*Grech v. Clayton County*, 335 F.3d 1326, 1329-30 (11th Cir. 2003) (alterations, emphasis, and ellipsis supplied).

In other words, in the absence of proof of an *official* policy, a plaintiff asserting a federal constitutional claim against a private entity such as Corizon under 42 U.S.C. § 1983 must demonstrate that some *unofficial* policy has been carried out so pervasively through repeated acts that it is fair to attribute the conduct to the apparently condoning municipality. *See Craig v. Floyd County*, 643 F.3d 1306, 1311 (11th Cir. 2011) (quoting *Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000)) ("In the absence of a series of constitutional violations

from which deliberate indifference can be inferred, the plaintiff[] must show that the *policy itself* is unconstitutional.") (internal quotation marks omitted, alteration in *Craig*, emphasis supplied).

Note well that "'[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability' against a municipality," or an entity like Corizon that has metaphorically stepped into the legal "shoes" of the Alabama Department of Corrections. *Craig*, 643 F.3d at 1310 (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)) (alteration supplied); *id.* at 1311 ("Even if we assume that these practices amount to constitutional violations, [the plaintiff] did not even present evidence that these practices had been employed by Georgia Correctional *for any other detainees*.") (alteration and emphasis supplied); *id.* at 1311-12 (holding that the plaintiff's expert witness, who testified as to experiences at other jails, did not help plaintiff establish "a policy or custom . . . [that] has led to more than one alleged constitutional violation," and that a plaintiff must present evidence of similar constitutional violations occurring at the *facility in which he is incarcerated*) (ellipsis and alteration supplied).

Plaintiff has not presented any examples of an unofficial Corizon policy or practice that resulted in an unconstitutional delay or denial of necessary medical care

to inmates *other than himself*.[78]   Consequently, he must prove that deliberate indifference was manifested through an *official* Corizon policy.

Plaintiff attempts to prove an official policy of deliberate indifference by offering excerpts from Corizon's "Provider Info" manual,[79] and deposition testimony by Dr. Hugh Hood, the Regional Medical Director of Corizon, from a prior lawsuit.[80] For instance, the manual states, "We are stuck with these types of patients [*i.e.*, inmates]."[81]   It also indicates that cost is a major, if not the preeminent, factor Corizon providers should consider when making treatment decisions regarding inmates, and strongly suggests that the containment of costs is more important than doing one's "best."[82]

> CMS is acutely aware of costs and practice habits.  It is necessary to use more and more guidelines to educate physicians about appropriate but cost effective care.  It is the physician's nature to want to do the "best" for the patient.  However, the "best" is often a reflection of the physician's past practice habits in a system that was not overly

---

[78] Plaintiff submitted a scan of a LexisNexis search for all cases in which Corizon was named as a party.  This search yielded 777 results.  *See* doc. no. 51 (Plaintiff's Response in Opposition to Summary Judgment), ¶ 95, at 5; doc. no. 51-6 (LexisNexis search results).  Even so, plaintiff fails to identify any specific instances in which Corizon's purported policy of deliberately depriving inmates of needed health care for the purpose of saving costs resulted in a judgment for an inmate housed at any of the facilities in which he was incarcerated.  *See Craig v. Floyd County*, 643 F.3d 1306, 1311-12 (11th Cir. 2011).

[79] *See* doc. no. 51-3.

[80] *See* doc. no. 51-2.

[81] *Id.* at ECF 3 (alteration supplied).

[82] *See* doc. no. 51-3 (Corizon "Provider Info" Manual), at ECF 3.

concerned with costs.

> . . . .

> [T]he prison medical director has to keep an eye on utilization of all off-site procedures . . . The patients should be returned, as soon as possible, to the prison or jail to be managed on-site.

>> The primary cause of cost overruns is due to off-site medical care. This is the essential reason for putting well-trained primary care doctors at the prison site. The more we can do, the better the cost control.

> . . . .

>> In the prison and jail health care business, these costs cannot be transferred to the patient or, in most cases, to the client. It is very difficult to get a contract increase in payment when dealing with government entities. Therefore, we are forced to look at each and every case with cost containment related to necessary medical care.

Doc. no. 51-3 (Corizon's "Provider Info" Manual), at ECF 3, 5, 7 (ellipsis and alteration supplied).

Dr. Hood testified that Corizon has a "full risk" contract with ADOC, which means that ADOC pays Corizon a predetermined monetary amount, regardless of the extent to which Corizon's on-site services or other, off-site medical services are utilized.[83] In other words, the less treatment inmates receive, the higher the profit realized by Corizon.[84] Even so, Corizon argues that

---

[83] *See* doc. no. 51-2 (Hood Deposition), at 113.

[84] *See id.* at 115.

[a] mere allegation that Corizon did not provide treatment to Mr. Norwood to save money, although this is not supported by the medical records, is insufficient to overcome summary judgment as there is no evidence of a policy or procedure utilized by Corizon to not provide Mr. Norwood necessary medical treatment.  The medical records clearly show that Mr. Norwood was taken to the hospital as soon as he complained about pain in his eye, he was thereafter seen by multiple specialists and outside medical providers and underwent four separate surgeries.  Certainly not evidence of medical providers trying to save money.

Doc. no. 35-1 (Corizon's Amended Brief in Support of Summary Judgment), at 16-17 (alteration supplied).  Contrary to Corizon's argument, however, plaintiff was *not* "taken to the hospital as soon as he complained about pain in his eye."[85]  In spite of submitting several sick call slips pursuant to Corizon's policy, plaintiff was forced to wait *over four days* to be examined by a doctor.  During that period, plaintiff's eye continued to swell, to the point that it eventually was swollen shut, and the extent of the attention he received from the Corizon staff consisted of being given some Tylenol tablets, and instructed to "get the hell out" of the health care unit.[86]

Even so, plaintiff has not presented any legal authority indicating that the policies enumerated in either the "Provider Info" manual or the "sick call" methodology are facially unconstitutional.  *See Craig*, 643 F.3d at 1312 (stating that

---

[85] *See* doc. 35-3 (Hood Affidavit), at ECF 3.  Plaintiff was injured on Monday, May 5, 2012, and was first seen in the health care unit on Friday, May 9, 2012.  He was seen at Crestwood Medical Center in the early morning hours of Saturday, May 10, 2012.

[86] *See* doc. no. 35-2 (Norwood Deposition), at 91.

it is a "highly questionable assumption" to say that a "policy or custom of using the least costly means of treating patients" would, by itself, "amount to a constitutional violation.").

In short, plaintiff has failed to demonstrate an unconstitutional policy of deliberate indifference through either of the two possible ways — that is, by showing that an *unofficial* policy or procedure is so pervasive that it is fair to impute conduct undertaken pursuant to that policy to Corizon, or by showing that any *official* Corizon policy is unconstitutional on its face.

Moreover, even if plaintiff *could* demonstrate an unconstitutional policy or procedure, an "'inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed.'" *Easley v. Department of Corrections*, 590 F. App'x 860, 869 (11th Cir. 2014) (quoting *Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1188 (11th Cir. 1994) (*overruled in part on other grounds*)). There is no evidence in plaintiff's medical records that any delay in treatment caused or exacerbated his *glaucoma*.

Therefore, and in spite of the high likelihood that Corizon's full-risk contract model and sick call methodology encourage the delivery of substandard healthcare services to inmates, summary judgment is due to be granted in favor of Corizon on

25

plaintiff's Eighth Amendment deliberate indifference claim.

### IV.  PLAINTIFF'S EIGHTH AMENDMENT DELIBERATE INDIFFERENCE CLAIM AGAINST THE INDIVIDUAL ADOC DEFENDANTS

This court dismissed plaintiff's claims against the ADOC defendants in their *official capacities* pursuant to the doctrine of sovereign immunity.[87]  The court declined to dismiss plaintiff's Eighth Amendment claim against the ADOC defendants under the doctrine of qualified immunity at the time it entered an order on the ADOC defendants' motion to dismiss.[88] Because of discovery undertaken since the entry of that order, however, it now is necessary to revisit the question of whether the ADOC defendants are entitled to the benefits of the qualified immunity doctrine.

It is well-settled that the doctrine provides "immunity from suit to government officials performing discretionary functions as long as 'their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Green v. Brantley*, 941 F.2d 1146, 1148 (11th Cir. 1991) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The purpose of the doctrine is to allow government officials to execute their discretionary duties without fear of personal liability or harassing litigation. *Anderson v. Creighton*, 483 U.S. 635,

---

[87] *See* doc. no. 19 (Memorandum Opinion and Orders), at 8-9.

[88] *See id.* at 19.

638 (1987); *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002).  Even so, "qualified immunity would be defeated if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff] . . . ."  *Harlow*, 475 U.S. at 815 (internal quotation marks and emphasis omitted, alteration in original).

    To claim the benefits of qualified immunity, the public official "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'"  *Courson v. McMillian*, 939 F.3d 1479, 1487 (11th Cir. 1991) (quoting *Rich v. Dollar*, 841 F.3d 1558, 1563 (11th Cir. 1988)).  The individual defendants contend that they have done so, because "[e]verything alleged in the Complaint describes the defendants doing what correctional officials do: supervising and controlling inmates and running prisons."[89]  The court agrees.  "It has long been held that the decision to bestow or deny medical services to prisoners . . . is a discretionary function for purposes of qualified immunity analysis."  *Cooper v. Rogers*, 968 F. Supp. 2d 1121, 1130 (M.D. Ala. 2013) (citing *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010)) (ellipsis supplied).  Accordingly, the burden shifts to plaintiff to demonstrate that qualified immunity is not appropriate.

---

[89] Doc. no. 37 (ADOC Defendants' Amended Brief in Support of Summary Judgment), at 14 (alteration supplied).

*See Lee*, 284 F.3d at 1194.

Courts generally apply a two-part test in determining whether a defendant is entitled to the defense of qualified immunity. The "threshold question" is whether the facts, viewed "in the light most favorable to the party asserting the injury," show that the prison official's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If that question is answered in the affirmative, then the court will proceed to the second step of the analysis, which seeks to determine whether the right was "clearly established." *Id.*[90]

"The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." *Campbell v. Sikes*, 169 F.3d 1353, 1363 (11th Cir. 1999); *see also Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on a claim of this variety, a plaintiff must satisfy three *prima facie* elements: that is, show that he suffered from a serious medical need; the defendant was deliberately indifferent to that need; and, that there is a causal linkage between the defendant's indifference and plaintiff's

---

[90] The Supreme Court has relieved lower courts from mandatory adherence to the order of the two-part analytical framework established by the *Saucier* opinion. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in Saucier, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."). It now is within the court's discretion to, in appropriate cases, assume that a constitutional violation occurred for purposes of addressing, in the first instance, whether such a violation would be "clearly established." *Id.* Nevertheless, under the circumstances of this case, *Saucier*'s tested sequence of analysis will be followed.

injury. *Mann v. Taser International, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).

The individual defendants do not challenge the first element.  Indeed, it would be difficult for them to do so, because plaintiff's eye injury unequivocally constituted a serious medical need.  *See Brown v. Hughes*, 894 F.2d 1533, 1538 n.4 (11th Cir. 1990) ("Evidence of recent traumatic injury . . . has generally been sufficient to demonstrate a serious medical need.") (ellipsis supplied); *Aldridge v. Montgomery*, 753 F.2d 970, 972-73 (11th Cir. 1985) (holding that a 1.5-inch laceration over plaintiff's eye, bleeding for 2.5 hours, constituted a serious medical need).

This court need not proceed to the causation factor, however, as plaintiff has failed to prove that the ADOC defendants acted with deliberate indifference to his serious medical needs.  "In our circuit, to find deliberate indifference on the part of a prison official, a plaintiff inmate must show:  (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than gross negligence."  *Thomas v. Bryant*, 614 F.3d 1288, 1312 (11th Cir. 2010) (citing *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010)).  This court will analyze the issue of deliberate indifference for each of the ADOC defendants, in turn.

Defendant Kim Thomas, Commissioner of the Alabama Department of Corrections, testified that he has never met plaintiff and did not know of plaintiff's

injury or related issues until he was served with this lawsuit.[91]  Even so, plaintiff

contends that Commissioner Thomas is liable for his role in "award[ing] Corizon the

contract for Alabama inmates' medical care," and for doing so "without regard to the

numerous legal actions Corizon is involved in across the United States."[92]  Plaintiff

also states that he named Commissioner Thomas as a defendant in this action

"[b]ecause he's the commissioner," and because he "is over the prison system" and

"ran it."[93]  Plaintiff concedes that he has never met Commissioner Thomas, spoken

with him, or submitted a grievance to him.[94]  None of the foregoing facts demonstrate

that Commissioner Thomas had subjective knowledge of a risk of serious harm to

plaintiff and, with such knowledge, disregarded the risk.  Accordingly, plaintiff's

Eighth Amendment claim against Commissioner Thomas is due to be dismissed.

Similarly, defendant Leon Forniss, Warden of Staton Correctional Facility, has

never met plaintiff.[95]  Plaintiff sued Warden Forniss because "[h]e run[s] the prison,"

"sign[s] all the paperwork of people going in and out of that prison," and "know[s]

everything."[96]  Those vague allegations do not demonstrate that Warden Forniss had

---

[91] *See* doc. no. 31-6 (K. Thomas Affidavit), at 2.

[92] Doc. no. 51 (Plaintiff's Brief in Opposition to Summary Judgment), at 5 ¶ 95 (alteration supplied).

[93] Doc. no. 35-2 (Norwood Deposition), at 176-77 (alteration supplied).

[94] *Id.* at 177.

[95] *Id.* at 124.

[96] *Id.* (alterations supplied).

"subjective knowledge of a risk of serious harm" and disregarded that risk through conduct amounting to more than gross negligence.  *See Thomas*, 614 F.3d at 1312; *see also Hall v. Smith*, 170 F. App'x 105, 107-08 (11th Cir. 2008) (citing *Marsh v. Butler County*, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001)) ("Vague and conclusory allegations will not support a claim under § 1983.").  Accordingly, plaintiff's Eighth Amendment claim against Warden Forniss is due to be dismissed.

Defendant Bettina Carter, Warden of Decatur Work Release Facility, *did* have subjective knowledge of plaintiff's eye injury, because she met with plaintiff on March 27, 2012, to discuss his eye injury.  She testified,

> Inmate Norwood did tell me his eye was injured and he was concerned about not seeing the free world doctor regarding treatment of it.  I picked up the phone, called medical and inquired about Inmate Norwood's complaint.  I don't recall whom I spoke with, but they informed me Inmate Norwood had an appointment on March 30th that is in approximately 3 days to see the free world eye specialist.  It is security policy and procedures not to inform inmates of the exact times and dates of appointments or transfers.

Doc. no. 31-3 (Carter Affidavit), at 2.

Plaintiff admits that he spoke with Warden Carter "on or about" March 27, 2012, and his medical records indicate that he saw an optometrist on March 30, 2012.[97]  Even so, plaintiff alleges that Warden Carter told him during their meeting

---

[97] Doc. no. 35-3 (Medical Records), at ECF 38; doc. no. 35-2 (Norwood Deposition), at 141; doc. no. 31-2 (Inmate Movement History), at ECF 6.

that "she was a busy woman and she [was] trying to run a prison."[98]  That is not

constitutionally significant:  plaintiff asked Warden Carter for help and, regardless

of whether she was polite, plaintiff was examined by an optometrist within three days

of their conversation.

Finally, plaintiff alleges that Warden Carter prevented him from going to his

follow-up appointment within "one day" after he went to the emergency room at

Crestwood Medical Center on March 10, 2012.[99]  He bases that allegation on the fact

that Warden Carter has access to the inmates' paperwork and should have known that

he needed to go to a follow-up appointment.  Even so, he presents no evidence that

Warden Carter had any subjective or actual knowledge of the need for a twenty-four-

hour follow-up visit.  *See Goodman v. Kimbrough*, 718 F.3d 1325, 1334 (11th Cir.

2013) (citing *Farmer*, 511 U.S. at 838; *Paul v. Davis*, 424 U.S. 693, 701 (1976)) ("[A

deliberate indifference plaintiff] cannot say, 'Well, they should have known.'  Were

we to accept that theory of liability, the deliberate indifference standard would be

silently metamorphosed into a font of tort law — a brand of negligence redux —

which the Supreme Court has made abundantly clear it is not.") (alteration supplied).

Viewing the facts in the light most favorable to plaintiff, Warden Carter did not

---

[98] Doc. no. 35-2 (Norwood Deposition), at 140 (alterations supplied).

[99] *Id.* at 145.

disregard any risk of serious harm of which she had subjective knowledge, and plaintiff's Eighth Amendment claim against her is due to be dismissed.

Defendant LeVan Thomas, Warden of the Frank Lee Work Release Center, had "numerous conversations" with plaintiff.[100]  Plaintiff claims that Warden Thomas stated that he did not see anything wrong with plaintiff's eye (although plaintiff does not dispute that, to a lay person, there would have been no outward signs of injury by the time he was at Frank Lee).[101]  Even so, plaintiff contends that he told Warden Thomas everything that had happened to his eye, thereby providing notice to Thomas.[102]

Although plaintiff could perhaps prove that Warden Thomas had subjective knowledge of a serious risk of harm, plaintiff cannot prove that Warden Thomas disregarded that risk by conduct amounting to more than gross negligence.  *See Thomas*, 614 F.3d at 1312.  Plaintiff contends that he was only transported to Staton Correctional Facility for medical care "half of the time [he] was trying to go," and that, after one of his eye operations, Warden Thomas failed to ensure that plaintiff's prescriptions were filled.[103]  When asked by counsel for the ADOC defendants how

---

[100] *Id.* at 153.  "I called Warden Thomas, I know, over 150 times in a year-and-a-half."  *Id.*
[101] *Id.* at 153-54.
[102] *Id.* at 155.
[103] *Id.* at 156 (alteration supplied), 158.

Warden Thomas would have known that he was not receiving his medications, plaintiff testified that Warden Thomas "[knew] [plaintiff's] work schedule and he [knew] the pill call schedule."[104]   An insinuation that Warden Thomas *should have known* of a serious risk of harm to plaintiff is not enough.  "Deliberate indifference is not the same thing as negligence or carelessness.  To the contrary, the Supreme Court has made clear that a state official acts with deliberate indifference only when he disregards a risk of serious harm of which he is *actually aware*."  *Ray v. Foltz*, 370 F.3d 1079, 1083 (11th Cir. 2004) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)) (internal citations omitted, emphasis in original).

If Warden Thomas acted in any culpable manner, he was, at most, negligent. Plaintiff's deliberate indifference claim against him is accordingly due to be dismissed.

In summary, this court concludes that each of the ADOC defendants is entitled to qualified immunity.

## V.  DISCUSSION OF PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS PURSUANT TO 42 U.S.C. § 1985(3)

Plaintiff also asserts a claim for intentional infliction of emotional distress

---

[104] *See* doc. no. 35-2 (Norwood Deposition), at 167 (alterations supplied).

under 42 U.S.C. § 1985(3).[105]   That section provides for the recovery of damages by a party who is injured as a result of a conspiracy to deprive any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.   The statute reads as follows:

**(3)  Depriving persons of rights or privileges**

> If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice-President, or as a member of the Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).  There are four *prima facie* elements of a claim based upon § 1985(3):

---

[105] *See* doc. no. 1 (Complaint), at 9-10, ¶¶ 35-42.

> (1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Childree v. UAP/AG Chem, Inc.*, 92 F.3d 1140, 1146-47 (11th Cir. 1996); *see also*

*Lucero v. Operation Rescue of Birmingham*, 954 F.2d 624, 627-28 (11th Cir. 1992)

(same); *Burrell v. Board of Trustees of Georgia Military College*, 970 F.2d 785, 793-

94 (11th Cir. 1992) (same).

Strangely, plaintiff does not assert any allegations of conspiracy in his

complaint. Even so, the court need not reach the merits of plaintiff's § 1985(3) claim,

because — as the Eleventh Circuit observed in *Lucero v. Operation Rescue of*

*Birmingham*, 954 F.2d 624 (11th Cir. 1992) — such claims have been construed to

apply only to equal protection violations predicated upon class-based animus.

> Plaintiffs failed to establish a substantial likelihood of success on the merits because they did not state a claim under section 1985(3). In particular, plaintiffs failed to identify 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus' behind defendants' actions, as required under *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S. Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)).

*Lucero*, 954 F.2d at 627. In describing the groups protected under § 1985(3), the

Eleventh Circuit stated that:

> Two types of classes come within § 1985(3)'s protection: (1) classes

36

having common characteristics of an inherent nature — i.e., those kinds
of classes offered special protection under the equal protection clause,
and (2) classes that Congress was trying to protect when it enacted the
Ku Klux Klan Act.  *Kimble v. D.J. McDuffy, Inc.*, 648 F.2d 340, 347
(5th Cir.) (en banc), *cert. denied*, 454 U.S. 1110, 102 S. Ct. 687, 70 L.
Ed. 2d 651 (1981).

*Childree v. UAP/GA AG Chem.*, 92 F.3d 1140, 1147 (11th Cir. 1996).

The only classes of which plaintiff could be a member are African-American

persons, males, and inmates.  Plaintiff's statuses as an African-American or as a male

are not relevant, because he has neither alleged nor offered any evidence that racial

or gender-based animus motivated any of the defendants' conduct.  With regard to his

status as an inmate, the Eleventh Circuit has held that § 1985(3) is not applicable to

individuals so classified:

> [The plaintiff] alleges that he states a claim against the Defendants under
> § 1985(3) because he is a member of the 'prisoner class.'  Although we
> have never addressed whether prisoners are a protected class under §
> 1985(3), we conclude that the district court properly dismissed [the
> plaintiff's] § 1985(3) claim because *prisoners are neither a class offered
> special protection under the equal protection clause nor a class that
> Congress intended to protect when it enacted § 1985(3).*

*Farese v. Scherer*, 342 F.3d 1223, 1229 n.7 (11th Cir. 2003) (alterations and

emphasis supplied).  Accordingly , plaintiff's claim pursuant to 42 U.S.C. § 1985(3)

is due to be dismissed.

## VI.  DISCUSSION OF PLAINTIFF'S STATE-LAW CLAIMS

Plaintiff's complaint also asserts state-law claims for wantonness and breach of contract.[106]  In cases where the court's jurisdiction is based solely upon a federal question, the district court has discretion to entertain state claims that are supplemental to the federal claim.  *See* 28 U.S.C. § 1367(a).[107]  The district court may decline to exercise supplemental jurisdiction when:

(1)   the claim raises a novel or complex issue of State law,

(2)   the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)   the district court has dismissed all claims over which it has original jurisdiction, or

(4)   in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  The Supreme Court added a gloss to this statutory language in *Carnegie-Mellon University v. Cohill*, 484 U.S. 343 (1988), when observing that

a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience,

---

[106] *See* doc. no. 1 (Complaint), ¶¶ 43-48 (wantonness) and ¶¶ 49-56 (breach of contract).

[107] 28 U.S.C. § 1367(a) provides that:

(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

Case 5:14-cv-00430-CLS   Document 54   Filed 01/15/16   Page 39 of 40

fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendant [now "supplemental"] state-law claims.  When the balance of these factors indicates that a case properly belongs in state court, *as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain*, the federal court *should decline* the exercise of jurisdiction by dismissing the case without prejudice.

*Id*. at 349-50 (emphasis supplied) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-27 (1966)).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon*, 484 U.S. at 350 n.7; *see also L.A. Draper & Son V. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 428 (11th Cir. 1984) (stating that "if the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of state claims").

Here, the claims over which this court has original jurisdiction — plaintiff's Fourteenth Amendment substantive due process claim, Eighth Amendment deliberate indifference claim, and 42 U.S.C. § 1985(3) claim — are due to be dismissed. Accordingly, this court declines to exercise supplemental jurisdiction over plaintiff's state-law claims.

## VII.  ORDERS

In accordance with the foregoing, it is ORDERED that defendants' motions for summary judgment be, and the same hereby are, GRANTED in part, and DENIED in part.  It is ORDERED that plaintiff's Fourteenth Amendment substantive due process claim, Eighth Amendment deliberate indifference claim, and 42 U.S.C. § 1985(3) claim are DISMISSED with prejudice.  Plaintiff's state-law wantonness and breach of contract claims are DISMISSED, but without prejudice to plaintiff's right to re-file those claims in an appropriate state forum, if he so chooses.

Costs are taxed to plaintiff.

The Clerk is directed to close this file.

**DONE** and **ORDERED** this 15th day of January, 2016.

_____

United States District Judge